[Cite as *State v. Wuensch*, 2017-Ohio-9272.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105302**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# ANTHONY E. WUENSCH

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-604141-A

**BEFORE:** Jones, J., Keough, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** December 28, 2017

**ATTORNEY FOR APPELLANT**

Walter H. Edwards, Jr.
614 W. Superior Avenue, Suite 1300
The Rockefeller Building
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Jeffrey Schnatter
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Anthony Wuensch ("Wuensch") appeals his convictions of rape, gross sexual imposition, kidnapping with a sexual motivation specification, and underage alcohol use. The convictions were rendered after a bench trial. For the reasons that follow, we affirm.

## I.   Factual and Procedural Background

{¶2} The minor victim in this case, A.C., is Wuensch's biological niece. A.C.'s biological parents had substance abuse issues and lost custody of her when she was approximately three-and-a-half years old. After her parents lost custody of A.C., she went to live with foster parents, who adopted her when she was about six- and-a-half years old. Some of A.C.'s biological relatives, including Wuensch, maintained a relationship with A.C. and her adoptive family. Wuensch was married with children, and A.C. frequently visited with him and his family.

{¶3} The record demonstrates that, during the relevant time period, A.C. had psychological issues. She first began treating with a psychologist, Dr. Michael Esson ("Dr. Esson"), shortly after she was adopted. As A.C. grew older, her issues intensified and included self-harm behaviors and substance abuse. In 2013, she was placed in a treatment facility after a self-cutting incident, and from January 2014 through March 2014 she participated in an intensive outpatient program. The incident giving rise to this case occurred on March 24, 2014; A.C. was 15 years old at the time. In the time frame leading up to the subject incident, A.C.'s adoptive parents were going through a divorce

and A.C.'s relationship with her mother was contentious. A.C. had also recently broken up with her boyfriend.

{¶4} On the day of the incident, A.C. and her mother had an argument. After the argument, her mother drove her to cheerleading practice. A.C. decided that she did not want to stay for the practice, however, and walked to Wuensch's house. Wuensch was home alone, and called A.C.'s mother to let her know that A.C. was there. The mother gave permission for A.C. to spend the night there and brought her a change of clothes. The mother testified that she was not aware that Wuensch was home alone, however, and that if she had known that, she would not have allowed A.C. to stay.

{¶5} A.C. testified at trial as to the following events that occurred after her arrival at Wuensch's house. The two first talked about marital problems that Wuensch and his wife were having. Later, they went in the basement and they both were smoking cigarettes; Wuensch was drinking beer, and he gave a can to A.C., but she only drank a little of it. A.C. testified that Wuensch was consuming a large quantity of beer. She also testified that that evening was not the first time she had smoked and drank with Wuensch.

{¶6} According to A.C., the conversation eventually turned to one about sex life, with Wuensch asking her personal questions about hers, telling her that he had not had sex in a while, and asking if she could "hook him up" with one of her friends. The two then talked about A.C.'s recent break-up with her boyfriend, and they decided that they would go "egg" his house; they left Wuensch's house sometime between 11:00 p.m. and

midnight.

{¶7} They first walked to the house of one of A.C.'s good friends. The friend came outside to talk to A.C. and Wuensch. The friend testified at trial, and told the court that Wuensch appeared to be under the influence of alcohol — he was acting "silly and out of control" — and he and A.C. were "goofing off" with each other. The friend testified that A.C. and Wuensch told her of their plan to "egg" A.C.'s former boyfriend's house.

{¶8} According to A.C., when she and Wuensch left her friend's house, they went back to Wuensch's house to get changed and get some eggs. They then left on foot to go to the former boyfriend's house. A.C. testified that while they were walking to the former boyfriend's house, Wuensch again started with conversation that was sexual and personal in nature.

{¶9} As they neared the former boyfriend's house, Wuensch twisted his ankle, which prompted him to tell A.C. that she "owed" him. A.C. asked him what he meant, and Wuensch told her that she would have to show him her breasts for 30 seconds or give him a full body massage. A.C. testified that she figured Wuensch was being "weird" because he was intoxicated and she just "laughed it off." But Wuensch kept telling her that she "owed" him. The two then vandalized the former boyfriend's house. The boyfriend's father confirmed that his house had been vandalized, but testified that both he and his son were unaware at the time it happened of who was responsible.

{¶10} When they arrived back at Wuensch's house, they went into the basement,

and Wuensch again told A.C. that she would have to either show him her breasts or give him a full body massage. Uncomfortable, A.C. told Wuensch that she was going to go upstairs to bed. As she was walking up the stairs, Wuensch grabbed her arm and told A.C. that she was not leaving until she gave in to his demand. A.C. testified that she showed Wuensch her breasts because she felt that was the only way she could escape him, and indeed he did let her go after she had done so.

{¶11} A.C. went upstairs into a bedroom, closed and locked the door, and proceeded to get ready for bed. While she was lying in bed, she heard Wuensch trying to get into the room; eventually he did. He got into bed with her and sexually assaulted her. A.C. testified that she was crying and begging him to stop. The assault ended after she kicked him in his groin with her knee and she was able to get away. A.C. testified that she went into the living room to sleep, and Wuensch stayed in the bedroom.

{¶12} The following day, Wuensch told A.C. not to tell anyone about what had happened and that if she did she would never again be able to see his daughters, with whom she was very close. A.C. testified that although she spent the day at Wuensch's house, she tried to keep her distance from him. Her mother picked her up in the early evening, and although she thought about telling her what had happened, she decided not to out of fear of never seeing Wuensch's daughters again.

{¶13} A day or two later, A.C. told the friend whom she and Wuensch had visited what happened. A.C. testified that the friend told her that she (the friend) "felt like something like that was going to happen" because Wuensch had been acting "weird" that

night.   A.C. told her friend not to tell anyone, and the friend testified that she did not tell anyone because she did not believe it was her place to say anything.   The friend testified that, after A.C.'s disclosure, her relationship with her changed because A.C.'s behavior began to change.

{¶14} A.C. testified that she was depressed after the incident.   She engaged in self-harm behaviors because she wanted to die, and started using "hard" drugs.   She admitted, however, that her behavioral, substance abuse and mental health issues predated the sexual assault.

{¶15} A.C.'s mother testified that after March 2014, she noticed a drastic change in A.C., and asked Dr. Esson, who was counseling A.C., if he could determine why her behavior had changed so much.   The mother testified that she did not believe Dr. Esson was making progress with A.C., however, so she stopped A.C.'s treatment with him and began taking her to see another psychologist, Dr. Kathleen Payne ("Dr. Payne").

{¶16} Dr. Payne began treating A.C. in June 2014; she diagnosed her with post-traumatic stress disorder.   The doctor testified that, in September 2014, A.C. told her that in March 2014, she and her mother had an argument so she went to stay with Wuensch.   A.C. told Dr. Payne that Wuensch was drinking and complaining that he and his wife had not been having sex.   A.C. further told the doctor that Wuensch had asked her to show him her breasts, but she did not do it.   Dr. Payne consulted with colleagues after that disclosure, and ultimately decided that it was not a reportable incident.   She did tell A.C.'s parents, however.

**{¶17}** Dr. Payne testified that in August 2015, A.C. disclosed to her that Wuensch had raped her. A.C. told the doctor that she had not previously disclosed it because she was ashamed. She also told Dr. Payne that Wuensch told her that no one would believe her. Dr. Payne reported the disclosure the following day to the Cuyahoga County Department of Children and Family Services ("CCDCFS").

**{¶18}** Dr. Payne testified that it is not uncommon for such a disclosure, especially by adolescents, to be delayed because it takes time to build trust. She also testified that A.C.'s symptoms and reactions were consistent with those of a sexual abuse victim.

**{¶19}** After A.C. disclosed the rape to Dr. Payne, A.C. told her mother about the rape too. The two then went to the police. According to A.C.'s mother, even prior to officially learning about the rape, she had discovered evidence that led her to believe that something had happened to A.C. Specifically, she found a note on A.C.'s cell phone stating that she had been sexually molested by her uncle. She also found a "goodbye" letter in A.C.'s journal, in which A.C., in part, accused Wuensch of rape. During her direct testimony, the mother read a poem A.C. had written, and subsequently emailed to her parents, that described her life story and intimated about trauma she had experienced in her life. The mother also read the "goodbye" letter written by A.C., in which, as mentioned, A.C. accused Wuensch of rape. There was no defense objection to the mother's testimony regarding these writings.

**{¶20}** Officer James Simeone ("Officer Simeone") of the North Royalton police department was the law enforcement officer who initially met with A.C. and her parents.

He testified that A.C. disclosed that she had been raped in March 2014, and she seemed upset, but was cooperative. A.C.'s mother told the officer about "suicide" notes written by A.C.

{¶21} Detective Dave Loeding ("Detective Loeding"), also of the North Royalton police department, was the lead detective in the case. He met with A.C. and her mother. At first, A.C. was reluctant to talk to him, but she eventually cooperated. The detective testified that he found a lot of consistency between what Officer Simeone had reported to him and what A.C. was telling him.

{¶22} A.C.'s mother provided Detective Loeding with poems written by A.C., portions of her diary, and materials found on her cell phone. The detective sent the cell phone to a forensic scientist for analysis, which concluded that data on the phone was consistent with the information A.C.'s mother stated she found on the phone.

{¶23} During opening statement, the assistant prosecuting attorney referenced, without objection from the defense, the poem written by A.C. describing the events in question. During the defense's opening statement, counsel referenced a "sexting" incident A.C. had been involved with and a prior allegation of sexual abuse A.C. had made.

{¶24} After opening statements were concluded, the trial court conducted in camera voir dire of A.C. regarding the past sexual abuse allegation. A.C. told the court that the incident had occurred in the summertime a couple of years prior to the incident in this case, when she was at her mother's boyfriend's house. A group of people, including

her mother's great nephew, who was 17 years old, were at the house. The teenagers in the group, including A.C., had been drinking beer and/or smoking marijuana. Later in the evening, A.C. and two of the other female teenagers were in a bedroom watching television and then "passed out." A.C. testified that the nephew came into the room and started touching her breasts and tried, unsuccessfully, to pull her pants down.

{¶25} A.C. told the court that the following day, she told the two girls who had been in the bedroom with her what happened. According to A.C., one of the girls who was "half asleep, half awake" had heard A.C. telling the nephew to "stop." A.C. stated that she told her mother about the incident a couple of months later, who told her it was up to her (A.C.) as to whether she wanted to contact the police. A.C. told the trial court that she decided not to get the police involved because she did not "want to ruin the family that [she] just had gotten."

{¶26} A.C. stated that she never denied that the incident occurred; rather when CCDCFS inquired about it, she "just would blow it off." She explained that by the time the agency got involved in her life, the incident with the nephew had "already passed * * * and * * * there was a much bigger thing that they were focused on." According to A.C., the nephew admitted to their family that the incident had occurred.

{¶27} At the conclusion of the voir dire, the trial court ruled that the defense would not be allowed to question A.C. about the prior allegation. The court reasoned that A.C. maintained that the incident had occurred, but stated her reasons for not wanting to formally report it, and thus found that it was not a false allegation of sexual abuse.

The trial court also ruled that the defense could not question A.C. on the alleged "sexting" incident.

**{¶28}** Defense counsel moved for a Crim.R. 29 judgment of acquittal at the conclusion of both the state's case and the presentation of all the evidence. Both motions were denied. The trial court found Wuensch guilty as indicted, and sentenced him to an aggregate four-year prison term. Wuensch now appeals, raising the following assignments of error for our review:

> I. The state committed prosecutorial misconduct by reading [A.C.'s] writings during opening statements.
>
> II. The state committed prosecutorial misconduct by referencing [A.C.'s] writings during closing arguments.
>
> III. Trial counsel was ineffective for failing to object to the admission of [A.C.'s] writings.
>
> IV. The trial court erred by disallowing evidence of [A.C.'s] previous allegations.
>
> V. Appellant's conviction were against the manifest weight of the evidence.

## II.     Law and Analysis

**{¶29}** In his first two assignments of error, which we consider together, Wuensch contends that the state engaged in prosecutorial misconduct during opening statement and closing argument, respectively.

**{¶30}** We begin our analysis by noting that defense counsel did not object to the statements and arguments now being challenged. We therefore review only for plain error. *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the

syllabus. Crim.R. 52(B) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), the Supreme Court of Ohio instructed:

> By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

{¶31} Under Crim.R. 52(B), the defendant bears the burden of demonstrating that a plain error affected his substantial rights. But even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to "prevent a manifest miscarriage of justice." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

{¶32} In regard to opening statement, Wuensch contends that the assistant prosecuting attorney engaged in misconduct by reading the poem written by A.C., in which she detailed what happened to her on the evening in question. Wuensch contends that the poem was a hearsay statement and that it was a "graphic, heavily dramatized version" of the events.

{¶33} Opening statements are not evidence. Rather, they are an outline of the case to be presented and are intended to give the factfinder a general idea of what each side expects the evidence to show. *State v. Wilson*, 1st Dist. Hamilton No. C-000670,

2002 Ohio App. LEXIS 1854, 13 (Apr. 19, 2002). Opening statements often serve to state the party's theory of the case. *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 24 (8th Dist.).

{¶34} Counsel should be afforded latitude by the trial court in making an opening statement. *Columbus v. Hamilton*, 78 Ohio App.3d 653, 657, 605 N.E.2d 1004 (10th Dist.1992), citing *Maggio v. Cleveland*, 151 Ohio St. 136, 84 N.E.2d 912 (1949), paragraph two of the syllabus. However, opening statements should not include matters that attempt to influence or sway the jury by making statements that counsel knows will not be supported by competent or admissible evidence. *Maggio* at 140-141.

{¶35} Notwithstanding that Wuensch's challenge to the poem relates to a non-evidentiary portion of the trial, we consider how this court has previously addressed the admission of alleged hearsay statements in instances where the declarant testified at trial. In that instance, this court held that because the "'main premise behind the hearsay rule is that the adverse party is not afforded the opportunity to cross-examine the declarant,'" *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶14, quoting *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 69, hearsay errors are "harmless where the defense had the opportunity to cross-examine the declarant." *Campbell* at *id.*, citing *Primeau* at *id.*

{¶36} Here, the defense had the opportunity to cross-examine A.C. about her version of the events. Further, as mentioned, this was a bench trial, and "when the trial court is the trier of fact, we presume that the judge disregards improper hearsay evidence

unless there is affirmative evidence in the record to the contrary." *Campbell* at ¶ 16, citing *State v. Crawford*, 8th Dist. Cuyahoga No. 98605, 2013-Ohio-1659, ¶ 61. There is nothing in this record that demonstrates that the trial court relied on the statements made by the assistant prosecuting attorney in opening statement. We therefore find no prosecutorial misconduct in regard to the opening statement.

{¶37} We next consider the state's closing argument, during which Wuensch contends that the assistant prosecuting attorney bolstered A.C.'s credibility by mentioning her "goodbye" letter.

{¶38} As with opening statements, prosecutors generally enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.).

{¶39} Upon review, in mentioning the "goodbye" letter, the assistant prosecuting attorney specifically stated that he was not trying to boost A.C.'s credibility with any of his arguments: "I'm not saying you should believe her because she * * * had a horrible life after March 24th, but what I'm saying is everything points to something in this girl's life dramatic, traumatic, happened right then in her life."

{¶40} We find nothing improper with the argument. Rather, the argument was an attempt to draw a reasonable inference from the evidence presented at trial. Further, as

discussed, because this was a bench trial, even if the state's reference to the "goodbye" letter was improper, we presume that the trial court did not rely on improper argument in reaching its verdict, unless it was otherwise shown that it did. Our review of the record does not indicate that the trial court relied on the "goodbye" letter in deciding its verdict.

{¶41} In light of the above, we do not find, under a plain error review, that the state engaged in prosecutorial misconduct. The first and second assignments of error are therefore overruled.

{¶42} In his third assignment of error, Wuensch contends that his trial counsel was ineffective for his failure to object to: (1) comments made during the state's opening statement and closing argument and (2) portions of the testimony of A.C.'s mother, consisting of when she read a poem A.C. sent her, testimony about statements found on A.C.'s cell phone, and testimony about A.C.'s "goodbye" letter.

{¶43} To establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation was deficient in that it "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 694.

{¶44} In evaluating a claim of ineffective assistance of counsel, a court must give

great deference to counsel's performance. *Strickland* at 689. A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bradley* at 141.

{¶45} We first consider Wuensch's claim as it relates to trial counsel's failure to object during the state's opening statement and closing argument. For the reasons discussed in addressing the first and second assignments of error, we find Wuensch's claim to be without merit.

{¶46} To summarize, in regard to A.C.'s poem read by the assistant prosecuting attorney during opening statement, the defense had the opportunity to cross-examine A.C. about her version of the events and, therefore, any error was harmless. In regard to the assistant prosecuting attorney's reference to the "goodbye" letter in his closing argument, the assistant prosecuting attorney specifically told the court that he was not attempting to boost A.C.'s credibility by mentioning the letter. Again, this was a bench trial, for which we presume that the court considered only the "'relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'" *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987), quoting *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). There simply is no showing here that the presumption should not apply.

{¶47} We next consider Wuensch's claim that his trial counsel was ineffective for not objecting during the mother's testimony regarding portions of the testimony of A.C.'s mother, specifically, when she read a poem A.C. sent her, testimony about statements

found on A.C.'s cell phone, and testimony about A.C.'s "goodbye" letter.

{¶48} We have reviewed the poem, and find that it does not even mention the rape or Wuensch (directly or indirectly). Rather, the poem speaks of A.C.'s childhood, her biological parents and their deaths, her adoptive parents and their divorce, and self-harm. Thus, if anything, the poem would have been beneficial to Wuensch to highlight that A.C. had problems before this incident and independent of him, thereby potentially questioning her credibility.

{¶49} We also find that counsel was not ineffective for failing to object to the mother's testimony about material she found on A.C.'s cell phone, stating that Wuensch had raped her. The testimony was redundant to the testimony of other witnesses and, we are not persuaded that, but for the testimony, the trial court would have reached a different verdict. *See State v. Summerall*, 10th Dist. Franklin No. 03AP-1024, 2004-Ohio-6599, ¶ 28.

{¶50} The same holds true for the "goodbye" letter that the mother read — the outcome of the trial would not have been different but for her reading of the letter. Moreover, it may have been part of the defense's trial strategy to not object because, in a portion of the letter, A.C. states that she has forgiven Wuensch and does not want him to go to jail. The failure to object is not a per se indicator of ineffective assistance of counsel because counsel may refuse to object for tactical reasons. *State v. Gumm*, 73 Ohio St.3d 418, 428, 653 N.E.2d 253 (1995). There are numerous ways to provide effective assistance of counsel, and debatable trial tactics and strategies do not constitute

a denial of that assistance. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). A reviewing court may not second guess decisions of counsel that can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 101, 477 N.E.2d 1128 (1985).

{¶51} In light of the above, all of Wuensch's claims of ineffective assistance of counsel are without merit. The third assignment of error is therefore overruled.

{¶52} For his fourth assigned error, Wuensch contends that the trial court erred by not allowing him to present evidence of A.C.'s claim of a prior sexual assault. As mentioned, the trial court held an in camera voir dire hearing under the authority of *State v. Boggs*, 63 Ohio St.3d 418, 588 N.E.2d 318 (1992), to address the issue.

{¶53} In *Boggs*, the Ohio Supreme Court addressed the issue of "whether the rape shield provisions of R.C. 2907.02(D) prohibit a defendant from cross-examining an alleged rape victim about prior false rape accusations [he or] she is alleged to have made." *Id.* at 420. The court held as follows:

> Before cross-examination of a rape victim as to prior false rape accusations may proceed, the trial judge shall hold an in camera hearing to ascertain whether such testimony involves sexual activity and thus is inadmissible under R.C. 2907.02(D), or is totally unfounded and admissible for impeachment of the victim. It is within sound discretion of the trial court, pursuant to Evid.R. 608(B), whether to allow such cross-examination.

*Id.* at 424. The court further held that if a defendant wants to question a victim about a false rape accusation, the defendant has the burden of proving that the allegation was false. *Id.* at 423. If it is demonstrated that any type of sexual activity occurred and the allegation was not false, then the victim is protected under the "rape shield" provision of

R.C. 2907.02, and the defendant may not question the victim about it.  *Id.*

**{¶54}** The trial court held a voir dire hearing of A.C., at which it learned of the incident A.C. claimed had occurred approximately two years prior to the incident in this case.   She never wavered from her claim that the incident had occurred, and she explained her reason for not reporting it.   After hearing that from A.C., the trial court decided that the allegation was not false and, therefore, that it would be protected under R.C. 2907.02.   On this record, we find no abuse of the court's discretion.   The fourth assignment is therefore overruled.

**{¶55}** In his final assignment of error, Wuensch contends that his convictions were against the manifest weight of the evidence.   We disagree.

**{¶56}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."   *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶57}** Wuensch contends that his convictions are against the manifest weight of

the evidence because there were inconsistencies among the testimony of the state's witnesses. For example, he cites that A.C.'s testimony that she did not start using "pills" until after Wuensch raped her, differed from other witnesses who testified that A.C. had used "pills" before that.

{¶58} Upon review, we find that there were minor inconsistences in the evidence presented by the state. But "[m]inor inconsistencies in witness testimony will not render a conviction so against the manifest weight of the evidence as to cause a miscarriage of justice." *State v. McNamara*, 8th Dist. Cuyahoga No. 104168, 2016-Ohio-8050, ¶ 38, citing *State v. Weems*, 8th Dist. Cuyahoga No. 102954, 2016-Ohio-701, ¶ 29-30.

{¶59} All the state's witnesses who had knowledge of A.C.'s behavior before the rape testified openly about it and there was no question that they, including A.C., were up-front about her behavioral issues and drug and alcohol abuse. Most importantly, the material statements made by the state's witnesses were consistent — that Wuensch had raped A.C. on March 24, 2014, and that the issues she was dealing with in her life intensified after that.

{¶60} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 11 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment of

conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at *id.* This is not an exceptional circumstance. The fifth assignment of error is therefore overruled.

{¶61} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

KATHLEEN ANN KEOUGH, A.J., and
EILEEN T. GALLAGHER, J., CONCUR