[Cite as *State v. Thorpe*, 2021-Ohio-1295.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                             :

    Plaintiff-Appellee,              :

                                      No. 109238

    v.                               :

ALONZO THORPE, JR.,                        :

    Defendant-Appellant.             :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 15, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-634964-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Yasmine M. Hasan, Gregory Mussman, and John Kirkland, Assistant Prosecuting Attorneys, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Aaron T. Baker, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Alonzo Thorpe Jr. ("appellant"), appeals his reckless homicide conviction and claims the following errors:

1.  The trial court erred in instructing the jury as to the lesser included offense of reckless homicide when there was no evidence that Alonzo Thorpe, Jr. specifically acted recklessly.

2.  Assuming arguendo it was proper to instruct the jury as to the lesser included offense of reckless homicide, the trial court erred in failing to also instruct the jury as to the lesser included offense of negligent homicide.

3.  The trial court erred when it permitted the admission of the BCI ballistics report containing language that the shell casing and bullet were a "match" to the specific firearm in question, contradicting its own previous grant of a defense motion in limine, ruling that the only language that could be used in this regard was "consistent with."

4.  The state engaged in prosecutorial misconduct at trial when it repeatedly made statements and asked questions, both exceeding the scope of their own experts' opinions and with no basis in evidence.

5.  The trial court erred in permitting expert witness testimony outside the scope of expert opinion disclosed during discovery in violation of Crim.R. 16.

6.  The trial court improperly denied the defense's motion to suppress without a hearing.

7.  The cumulative effect of multiple errors at trial, even if singularly not sufficient to warrant reversal, together deprived appellant of a fair trial and a denial of due process.

{¶ 2} We find no merit to the appeal and affirm the trial court's judgment.

## I.  Facts and Procedural History

{¶ 3} On January 8, 2018, at approximately 6:00 p.m., Duane Smith ("Smith") called the Garfield Heights Police Department to report that his daughter's mother was unresponsive in her home.  Police officers, who responded to the call, found Nicole Thorpe ("Nicole") lying on her side on the couch in her living room.  There was blood on her face and a pool of blood under her head.  The officers

concluded that Nicole had died of a gunshot wound to her head. (Tr. 630.) Police searched the house and found a shell casing on a table near the couch. They also found a cartridge case, typically ejected with the use of a semiautomatic handgun, but no gun was found at the scene.

{¶ 4} Appellant was subsequently charged with two counts of murder and two counts of felonious assault in connection with Nicole's death. Appellant was 15 years old and lived with his parents, Alonzo Thorpe Sr. ("Alonzo Sr.") and Ronda Thorpe ("Ronda"), in Shaker Heights, Ohio. Following a discretionary bindover hearing in juvenile court, appellant was bound over and tried as an adult in the Cuyahoga County Court of Common Pleas, General Division.

{¶ 5} Dr. Elizabeth Mooney, a forensic pathologist with the Cuyahoga County Medical Examiner's Office, testified at the jury trial that Nicole died as a result of a single gunshot wound to the head. (Tr. 1148.) The manner of death was ruled a homicide. (Tr. 1148, 1186.) Dr. Mooney could not ascertain an exact date and time of death, but concluded that Nicole must have been dead for at least a few hours before she was found given that "lividity [wa]s fixed." (Tr. 1225.) Other findings suggested that Nicole's death could have occurred up to 36 hours before she was found. Thus, Nicole had been deceased for at least a few hours and up to 36 hours when she was first discovered on the evening of January 8, 2018.

{¶ 6} Nicole was appellant's aunt. On January 6, 2018, Nicole picked appellant up from his home in Shaker Heights and brought him to her home in Garfield Heights to babysit her daughter, J.S., while she went out with her friend,

Lonniel Hawthorne ("Hawthorne"). Hawthorne testified that he and Nicole returned to the house between 2:00 and 3:00 a.m. The next morning, January 7, 2018, Hawthorne, Nicole, J.S., and appellant had breakfast together and watched television for a while. Smith, J.S.'s father, was expected to pick J.S. up later that afternoon. Hawthorne left the house at approximately 3:00 p.m. before Smith arrived and went to Gamestop before going to Euclid, where he remained for the rest of the day and night.

{¶ 7} Smith picked J.S. up at 3:30 p.m. Smith and J.S. testified that only Nicole and appellant remained in the home when they left the house. The next day, January 8, 2018, Smith texted Nicole to tell her he would be dropping J.S. off later that day, but Nicole never responded. When Smith arrived to drop J.S. off at approximately 6:00 p.m., the house was dark. J.S. entered the house and thought she saw her mother asleep on the couch. However, while unsuccessfully trying to wake her mother, J.S. noticed blood on her head and called to Smith, saying that her mother "doesn't look right." (Tr. 481, 592.) Smith entered the home and saw Nicole lying on her side. Smith noticed the pillow was stuck to her head with dried blood and called 911.

{¶ 8} The police arrived shortly thereafter. Smith and J.S. informed members of Nicole's family, who also arrived on the scene. Smith and appellant went to the Garfield Heights Police Department for questioning. Police wanted to question appellant after learning that he was with Nicole the day before she died. At the police station, Smith asked appellant what happened. Appellant replied that

after Smith left with J.S., Hawthorne returned to Nicole's house and went upstairs with her. (Tr. 488.) Appellant told Smith that he left Nicole's house shortly after Hawthorne returned.

{¶ 9} Appellant told investigators the same story. Appellant told Detective Mark Menary ("Det. Menary") of the Garfield Heights Police Department during two separate interviews that Hawthorne returned to Nicole's house after Smith picked up J.S. Appellant told detectives that he left the house shortly after Hawthorne arrived and suggested that Hawthorne was the last person to be with Nicole before she died. However, Det. Menary and Special Agent Jacob Kunkle of the Federal Bureau of Investigation ("Agent Kunkle") testified that they obtained cell phone records of Hawthorne's cell phone, which corroborated Hawthorne's statements to police that he stopped at the Gamestop before returning to Euclid, where he remained for the rest of the day. And, contrary to appellant's statement to police that he was in Shaker Heights on the night of January 7, 2018, appellant's cell phone records placed him in Garfield Heights at 7:01 p.m. that night. (Tr. 528.) Agent Kunkle explained that appellant's phone call at 7:01 p.m. could not have occurred at his Shaker Heights residence because "there are too many towers in between there with other sector's, approximately half a dozen at least that * * * would, in my opinion, provide a stronger, clearer, signal in that area." (Tr. 2166.)

{¶ 10} Appellant's friend, A.J., testified that appellant called him via FaceTime on the night of January 7, 2018. According to A.J., appellant was "overwhelmed," "crying," and "upset." (Tr. 536.) A.J. stated that appellant shared

a "trauma event" with him on FaceTime, which included seeing Nicole's dead body on the couch. A.J. explained: "He called my phone, crying, saying he heard a gunshot and he showed me what was happening and I told him to call the police or an ambulance." (Tr. 537.) A.J. further stated that appellant "was just crying not knowing what to do." (Tr. 539.)

{¶ 11} William Thorpe Sr. ("William"), Nicole's uncle, testified that he was like a father to Nicole. Nicole's mother was deceased and her father was not involved in her life. (Tr. 1650-1651.) After learning that appellant was one of the last people seen with Nicole before her death, William informed Det. Menary that appellant's parents had guns in their home. (Tr. 1670.) Once investigators concluded, based on cell phone records, that appellant was in Garfield Heights the night before Nicole was found dead and that he was the last person known to be with her while she was alive, they obtained a search warrant for appellant's house.

{¶ 12} During the search of appellant's house, Alonzo Sr. showed the officers where he and his wife kept all of their 9 mm handguns. While searching appellant's bedroom, police found a SCCY CPX 2-9 mm semiautomatic handgun with a magazine of live 9 mm rounds wrapped in an orange shirt in appellant's dresser. DNA analysis showed that DNA in a swab taken from the trigger of the gun found in appellant's dresser was consistent with appellant's DNA. (Tr. 1291.) DNA in a swab taken from the live rounds in the magazine also resulted in "a single DNA profile" that was consistent with appellant's DNA. (Tr. 1293.)

{¶ 13} Dylan Matt ("Matt"), a firearms expert with the Ohio Bureau of Criminal Investigation ("BCI"), testified that he tested the firearms and determined that all the firearms taken from appellant's home were operable. Matt testified that an intact 9 mm Luger bullet weighs approximately 115 grains and that the combined weight of the fired bullet and fired bullet jacket recovered from Nicole's brain weighed 114 grains. (Tr. 1473.) Matt made a microscopic comparison of a test-fired bullet from the SCCY Industries 9 mm Luger semiautomatic pistol found in appellant's dresser to the bullet recovered from Nicole's brain and concluded, based on microscopic striations imparted from the barrel's rifling on the bullet, that both the test-fired bullet and the bullet recovered from Nicole's brain were fired from the same SCCY Industries 9 mm Luger semiautomatic pistol. (Tr. 1474-1476.)

{¶ 14} The jury found appellant guilty of reckless homicide in violation of R.C. 2903.041, a third-degree felony with firearm specifications, which was a lesser included offense of Count 1 (murder). The jury acquitted him of all remaining charges. The court sentenced appellant to a mandatory three-year term of imprisonment on the firearm specifications to be served prior to, and consecutive to, a 36-month prison term on the reckless homicide conviction, for an aggregate 66-month prison term. Appellant now appeals his conviction.

## II. Law and Analysis

### A. Lesser-Included Offense

{¶ 15} In the first assignment of error, appellant argues the trial court erred in giving the jury an instruction on the lesser-included offense of reckless homicide.

He contends a reckless homicide instruction should not have been given because there was no evidence that he acted recklessly.

{¶ 16} The question of whether a particular offense should be submitted to the finder of fact as a lesser-included offense involves a two-tiered analysis. *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987).

{¶ 17} The second tier requires the court to review the evidence and determine whether "'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11. "Only in the second tier of the analysis do the facts of a particular case become relevant." *Deanda* at ¶ 6.

{¶ 18} With respect to the first tier, this court has previously held that reckless homicide is a lesser-included offense of murder. *State v. Chatmon*, 8th Dist. Cuyahoga No. 99508, 2013-Ohio-5245, ¶ 31, citing *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 112. With respect to the second tier, the Ohio Supreme Court has held that a trial court "must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the

lesser offense." *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, ¶ 34. We must, therefore, look to the evidence in this case and determine whether the "'jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Evans* at ¶ 13.

{¶ 19} R.C. 2903.041 governs reckless homicide and states that "[n]o person shall recklessly cause the death of another[.]" "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "Substantial risk" is defined in R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."

{¶ 20} A.J. testified that appellant called him via FaceTime and displayed Nicole's dead body to him the day before J.S. and Smith discovered her. (Tr. 530.) Cell phone records also placed appellant in the vicinity of the crime scene at 7:01 p.m. on January 7, 2018, the day before Nicole's dead body was found. The jury heard evidence that appellant had access to a 9 mm firearm, the kind of gun used to kill Nicole. Indeed, ballistics evidence showed that the bullet recovered from Nicole's body contained markings consistent with a bullet that was test-fired from the gun found in appellant's dresser, which indicated that the gun found in appellant's dresser was the gun used to fatally shoot Nicole. (Tr. 1474-1476.) And, appellant's DNA was identified on the trigger of the gun found in his dresser as well

as on the live rounds in the magazine. Moreover, cell phone records excluded all potential suspects who were known to be with Nicole on the day she died except for appellant. Because the evidence established that appellant was only the person who could have killed Nicole, the only question that remained was whether he caused Nicole's death intentionally or recklessly.

{¶ 21} There was no evidence that appellant intended to kill Nicole, nor was there any evidence of a struggle between Nicole and appellant. To the contrary, J.S. testified that appellant had a "really good" relationship with Nicole and that "they were close." (Tr. 585.) When Det. Menary was asked whether the shooting was accident, he testified:

> DET. MENARY: I wish I knew the answer. The evidence doesn't point either way, whether it was accident or an execution.
>
> THE COURT: What would be the reason that Alonzo Thorpe, Jr. would kill Nicole Thorpe?
>
> DET. MENARY: We don't have a reason or a motive.

(Tr. 1985-1986.)

{¶ 22} There was evidence that appellant was never taught how to use a gun. There was also evidence appellant smoked marijuana with Nicole. (Tr. 935, 939, 587.) The medical examiner testified that a toxicology study revealed that Nicole had marijuana metabolites in her system indicating that she smoked marijuana shortly before her death. (Tr. 1156.) Appellant's DNA was identified on cigar butts found in Nicole's home, suggesting that he smoked with Nicole.

{¶ 23} Appellant's father frequently went to the shooting range and always shot a firearm into the air on New Year's Eve. Thus, although appellant was not taught how to use guns, it is reasonable to infer that he was aware of the risks posed by firearms. The medical examiner testified that the presence of stippling on Nicole's face indicated that she was shot from close range. (Tr. 1172, 1174-1175.) A close-range shot demonstrates that appellant pointed the firearm at Nicole, despite the known risks of doing so. Indeed, the jury concluded that appellant disregarded a known risk when he fatally shot Nicole when it found appellant guilty of reckless homicide. And, in the absence of any evidence of intent or motive to cause Nicole's death, the trial court reasonably concluded that appellant could be acquitted of murder and convicted of the lesser-included offense of reckless homicide.

{¶ 24} Therefore, the first assignment of error is overruled.

## B. Negligent Homicide

{¶ 25} In the second assignment of error, appellant argues that, assuming arguendo, it was proper to instruct the jury on the lesser-included offense of reckless homicide, then the trial court should have also instructed the jury on negligent homicide. Appellant contends that, under a reasonable view of the evidence, a jury could have found him not guilty of murder but guilty of negligent homicide.

{¶ 26} However, appellant was charged with murder. The Ohio Supreme Court has held that "[n]egligent homicide is not a lesser included offense of murder." *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990), paragraph four of the syllabus. More recently, this court has held that while reckless homicide is a lesser

included offense of murder, negligent homicide is neither a lesser-included offense of murder nor of reckless homicide. *State v. Perrien*, 8th Dist. Cuyahoga No. 108339, 2020-Ohio-798, ¶ 89.

{¶ 27} As previously stated, whether a particular offense should be submitted to the jury as a lesser-included offense involves a two-tiered analysis. *Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889 at ¶ 13. In the first tier, known as "statutory-elements test," the court must determine whether the particular offense is a lesser-included offense of another "greater" offense. *Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6. In *Evans*, the Ohio Supreme Court explained that

> [i]n determining whether an offense is a lesser included offense of another, a court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed. (*State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, clarified.)

*Id.* at paragraph two of the syllabus.

{¶ 28} Reckless homicide is a third-degree felony, which carries a maximum penalty of up 36 months in prison. R.C. 2903.041(B); R.C. 2929.14(A)(3)(b). Negligent homicide is a first-degree misdemeanor, which carries a maximum penalty of up to 180 days in jail. R.C. 2903.05(B); R.C. 2929.24(A)(1). Therefore, reckless homicide carries a greater penalty than the penalty for negligent homicide.

{¶ 29} However, reckless homicide is defined as "recklessly caus[ing] the death of another or the unlawful termination of another's pregnancy." R.C.

2903.041(A).  Negligent homicide is defined as "negligently caus[ing] the death of another or the unlawful termination of another's pregnancy by means of a deadly weapon or dangerous ordnance."  R.C. 2903.05(A).  Thus, negligent homicide requires proof that the defendant used a deadly weapon or dangerous ordnance while reckless homicide does not.  Thus, it is possible for a defendant to have committed reckless homicide without also committing negligent homicide.  *State v. Smith*, 2d Dist. Greene No. 2006 CA 68, 2007-Ohio-2969, ¶ 22 ("[A] person can purposely or recklessly cause the death of another by means other than by a deadly weapon or dangerous ordnance.").  Because negligent homicide, which is a lesser offense of reckless homicide, requires proof of an additional element that is not required to establish reckless homicide, it is not a lesser-included offense of reckless homicide.  Therefore, the trial court properly declined to give such an instruction.

{¶ 30} The second assignment of error is overruled.

### C.  The BCI Ballistics Report

{¶ 31} In the third assignment of error, appellant argues the trial court erred by allowing the state to introduce a BCI ballistics report into evidence stating that the shell casing found at the crime scene and the bullet retrieved from Nicole's body were a "match" to the firearm recovered from appellant's dresser.  Appellant contends the admission of the report violated a prior ruling, in limine, providing that Matt, the state's ballistics expert, could only testify that the shell casing and bullet were "consistent with" the firearm.

{¶ 32} The admission or exclusion of evidence lies in the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). An abuse of discretion implies a decision that is unreasonable, arbitrary, or unconscionable. *State ex rel. DiFranco*, 144 Ohio St.3d 571, 2015-Ohio-4915, 45 N.E.3d 987, at ¶ 13. When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 33} Appellant cites no legal authority in support of his position that the state's ballistics expert could only testify that the bullet and casing were "consistent with" the firearm found in appellant's dresser and could not testify that the bullet and casing were a "match." And, because appellant failed to object to the admission of Matt's report at trial, he forfeited all but plain error. *State v. Mathis*, 8th Dist. Cuyahoga No. 107365, 2019-Ohio-3654, ¶ 34, citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 80.

{¶ 34} Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In a plain-error analysis, the appellant bears the burden on demonstrating that, but for the error, the outcome of the trial would clearly have been different. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 17.

{¶ 35} Appellant asserts the testimony that the markings on the shell casing were "consistent" with having been shot from the gun found in appellant's dresser

is not enough to prove that the gun found his bedroom was the gun used to kill Nicole.  He, therefore, argues that had the court prohibited Matt from describing the casing as a "match" to the gun found in appellant's room, he would have been acquitted.

{¶ 36} However, appellant's DNA was found on the shell casing found at the crime scene.  Appellant's DNA was also found on the trigger of the gun recovered from his dresser and on the live rounds in the magazine inside the gun.  (Tr. 1293.) Moreover, A.J. testified that appellant showed him Nicole's dead body during a FaceTime call, and cell phone records placed appellant in the vicinity of the crime on the night before Nicole's dead body was discovered by Smith and J.S.  The evidence showed that appellant was the last person known to be with Nicole while she was alive.  Therefore, even if Matt had been precluded from calling the shelling casing a "match" to the firearm found in appellant's dresser, the totality of the evidence was sufficient to establish appellant's guilt beyond a reasonable doubt. Therefore, appellant cannot establish that the admission of Matt's ballistics report amounted to plain error.

{¶ 37} The third assignment of error is overruled.

### D.  Prosecutorial Misconduct

{¶ 38} In the fourth assignment of error, appellant argues the state engaged in prosecutorial misconduct at trial when it made remarks during opening statements and asked questions of witnesses that exceeded the scope of their

experts' opinions. He also contends the state's questions were inappropriate because they were made without any basis in evidence.

{¶ 39} The test for prosecutorial misconduct is whether the prosecutor's "'remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "To demonstrate prejudice in this context, 'a defendant must show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred.'" *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 105, quoting *State v. Collier*, 8th Dist. Cuyahoga No. 78960, 2001 Ohio App. LEXIS 4663 (Oct. 18, 2001).

### 1. Opening Statements

{¶ 40} Appellant first contends that the prosecutor made improper remarks during opening statements.

{¶ 41} During opening statements, the prosecutor said:

> That's the gun that was used to murder Nicole Thorpe. You'll hear from a firearm's examiner that will testify based on science and his own test fires that he can determine that is the same weapon that killed Nicole Thorpe; the one sitting in his top drawer.

Appellant argues that this remark was inappropriate because it was not based in evidence.

{¶ 42} However, opening statements are not evidence. *State v. Wuensch*, 8th Dist. Cuyahoga No. 105302, 2017-Ohio-9272, ¶ 33. Rather, opening statements are

intended to apprise the jury as to what counsel expects the evidence to show. *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 45 (8th Dist.), citing *State v. Turner*, 91 Ohio App.3d 153, 631 N.E.2d 1117 (1st. Dist.1993). Therefore, "[t]he prosecutor may, in good faith, make statements as to what he or she expects the evidence will show." *Id.*, citing *State v. Patterson*, 5th Dist. Stark No. 2005CA00078, 2005-Ohio-6703.

{¶ 43} The prosecutor's comment that the firearm used to kill Nicole Thorpe was found in the top drawer of appellant's dresser was based on what he thought the evidence would establish during the trial. Indeed, the state's firearm expert testified during the trial that a shell casing found at the crime scene and a bullet recovered from Nicole's head was consistent with a shell casing and bullet that were test-fired from the gun found in appellant's dresser. Therefore, the statement was reasonably based on what the prosecutor believed the evidence would show. Although Matt did not expressly state that he gun found in appellant's drawer was the gun used to kill Nicole, the jury could reasonably make that inference based on the totality of the evidence presented at trial.

{¶ 44} Moreover, the jury was instructed that opening statements are not evidence and that the jury must decide the case based on the evidence presented. (Tr. 419-420.) The jury is presumed to follow the trial court's instructions. *State v. Graham*, Slip Opinion No. 2020-Ohio-6700, ¶ 135, citing *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Therefore, we cannot say that appellant was prejudiced by the prosecutor's opening remarks.

## 2. Witness Testimony

**{¶ 45}** Appellant further asserts that the state engaged in prosecutorial misconduct during its examination of Ronda and Alonzo Sr. With respect to Ronda's testimony, appellant objects to the following line of questioning:

Q: Well, you didn't know because you didn't discuss any of the evidence, right?

A: I didn't know what?

Q: That the cell phone records put your son there.

A: You said that in juvenile. You tried to say that the phone pinged. My son's phone pinged in that area. That's what you said. You and Detective Menary.

\* \* \*

Q: So it didn't get around that it was your gun, the gun that was used to kill Nicole Thorpe?

A: That was the day that you all came with a search warrant, and my husband was there. I was at work. I was on the phone with my husband when Detective Menary showed up at my house.

I overheard my husband say on the phone — the detective immediately came through the house says "Where is Alonzo Thorpe's room?" that's the first thing he said.

I was on the phone with my husband. I heard everything. And the first thing he said was, "Let me see that." My husband said, "Let me see that. Hmm. That looks like my wife's gun."

That's the first time I heard that.

\* \* \*

Q: So would it surprise you if we had a firearms expert say that that's the gun that killed Nicole Thorpe?

A:  Yeah, it would.

Q:  Your gun is the gun that killed Nicole Thorpe?

A:  That's what you say, but I don't believe it.

(Tr. 937-938.)

{¶ 46} Appellant asserts that these questions were improper because they were not based on evidence and misled the jury.  However, Agent Kunkle's testimony placed appellant in the vicinity of Nicole's home the night before she was found dead.  Agent Kunkle testified that appellant's cell phone "pinged" on cell phone towers in Garfield Heights on the afternoon of January 7, 2018, and later "pinged" on a tower near his home in Shaker Heights.  However, according to Agent Kunkle, the cell phone records demonstrate that appellant's phone left the Shaker Heights area later that evening and returned to Garfield Heights.  Agent Kunkle explained:

Q:  Young Mr. Thorpe, who is supposedly utilizing ***-9575, had gone up to his [Shaker Heights residence] and never left that residence, would that be consistent with what you see in there?  Would that be consistent with what you're seeing?

A:  As I previously testified, I can only tell you where this phone was, and the fact that the phone used the tower down in Garfield Heights indicates to me that it did not remain up in the Shaker Heights area during that entire time.

*   *   *

As I told you about before in that lawn sprinkler analogy, these towers were set to project those radio waves a certain distance from the tower, but not so far as to jump over the other towers or cause interference in other areas of the network by doing that.

So in my opinion, the tower that was used down here at 7:01 in Garfield Heights would have indicated the phone would be in the general vicinity of the Garfield Heights area and not up in the Shaker Heights area because of how Sprint's network is set up and based on my training and experience in evaluating networks and finding phones as a result of these records here throughout Northeast Ohio.

(Tr. 2164, 2168.) The prosecutor had a good faith basis for asking Ronda if she knew that cell phone records placed her son in the vicinity of the crime scene since the state's cell phone expert had evidence to support that fact. We, therefore, find nothing inappropriate in this line of questioning.

{¶ 47} As previously stated, the state's ballistics expert also testified that the shell casing from the crime scene and the bullet retrieved from Nicole's brain had markings consistent with a shell casing and bullet test-fired from the gun found in Alonzo Jr.'s dresser drawer. In the expert's opinion, the gun found in Alonzo Jr.'s drawer was the same gun that fired the fatal shot that killed Nicole. Thus, the prosecutor had a legitimate basis for asking Ronda if she was aware of the ballistics expert's opinion. And, Ronda had previously heard this evidence during the bindover proceedings in juvenile court. We, therefore, find nothing inappropriate about this line of questioning.

{¶ 48} Appellant nevertheless asserts that the state asked questions of Alonzo Sr. that inappropriately insinuated the state's belief that appellant was guilty. During the state's examination of Alonzo Sr., the prosecutor asked, "When did you find out that Alonzo killed Nicole?" and "So you heard the evidence before at the

prior hearing; you're aware that your son called your wife after Nicole was allegedly murdered?" (Tr. 1011, 1022.)

{¶ 49} There is nothing inappropriate about the second question because it does not imply that appellant committed murder, only that he called Ronda after Nicole was murdered. The first question is more problematic because it implies that appellant killed Nicole. However, it was an isolated comment. This court has held that "'where personal opinions of guilt are predicated upon the evidence, though frowned upon, they are not deemed to be prejudicially erroneous.'" *State v. Miller*, 2016-Ohio-7606, 73 N.E.3d 989, ¶ 38 (8th Dist.), quoting *State v. Reynolds*, 80 Ohio St.3d 670, 681, 687 N.E.2d 1358 (1998).

{¶ 50} In *Miller*, Miller was charged with attempting to murder his wife. The state argued that Miller's motive for trying to kill his wife was that his wife was considering divorce, and Miller did not want a divorce due to the financial strain it would cause. During trial, the prosecutor asked a question that implied Miller's guilt, and Miller argued on appeal that the inappropriate question deprived him of a fair trial. This court rejected Miller's argument on grounds that the evidence at trial demonstrated the defendant's guilt. This court explained that "the prosecutor's comments were therefore supported by facts in evidence from which the jury could make reasonable inferences as to Miller's motivation for his actions." *Id.* at ¶ 41. Indeed, this court went to state:

> Even assuming the prosecutor's comments as noted above were improper, we cannot say that these comments deprived Miller of a fair trial. Considering the remarks in the context of the entire trial, as we

are required to do, we do not find that such comments permeated the atmosphere of the entire trial such that Miller had been denied a fair trial. And other than the general assertion that the prosecutor's remarks prejudiced him, Miller fails to demonstrate how the outcome of the trial would have been different had the prosecutor not made such comments.

*Id.* at ¶ 42.

{¶ 51} The prosecutor in this case should not have suggested that appellant was guilty of murder while questioning his father. However, because the question was an isolated incident, and because the evidence of appellant's guilt was overwhelming, we cannot say that the single, inappropriate question deprived appellant of a fair trial. Indeed, the jury acquitted him of murder and found him guilty of the lesser-included offense of reckless homicide.

{¶ 52} Finally, appellant argues that the state asked inappropriate and prejudicial questions of Det. Menary. Specifically, appellant objects to the following:

Q: Did you expect to find a gun at that home that would match?

A: Almost three months later? I thought it was pretty unlikely.

(Tr. 1827-1828.) Appellant fails to explain how this question was inappropriate or prejudicial and we finding nothing improper with it.

{¶ 53} Therefore, the fourth assignment of error is overruled.

## E. Ballistics Expert

{¶ 54} In the fifth assignment of error, appellant argues the trial court erred by allowing, Matt, the state's ballistics witness to testify outside the scope of the opinions provided in his report.

{¶ 55} Crim.R. 16(K) provides:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 56} The purpose of Crim.R. 16(K) "'is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.'" *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55; *see also State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 48.

{¶ 57} In *Boaston*, the Ohio Supreme Court held that "'[f]ailure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial.'" *Id.* at ¶ 55, quoting Crim.R. 16(K) (emphasis in original). The trial court has no discretion to allow testimony outside the scope of an expert's report. *Id.* at ¶ 60. The Ohio Supreme Court concluded that the trial court in *Boaston* erred in allowing

expert opinions regarding the time and cause of a victim's death to come into evidence because the state's medical expert failed to disclose those opinions before trial. *Id.* However, the court in *Boaston* also determined that the error in allowing the opinions into evidence was harmless in light of the overwhelming evidence of the defendant's guilt. *Id.* at ¶ 71.

{¶ 58} As previously stated, Matt testified that he compared the shell casing found at the crime scene and the bullet recovered from Nicole's body with a shell casing and bullet that were test-fired from the gun found in appellant's dresser and determined that the shell casing from Nicole's house and the bullet from her brain were consistent with having been fired from the gun found in appellant's dresser. Matt also testified at trial that he compared the shell casing and bullet from the crime with shell casings and bullets test-fired from other firearms owned by appellant's parents and concluded that the other firearms were not involved in the shooting of Nicole. Defense counsel objected to this testimony at trial, claiming they were unaware that Matt test-fired other weapons.

{¶ 59} Although the other firearms were not specifically discussed in Matt's report, the state turned over Matt's entire case file, including work product, to defense counsel during discovery. Matt's notes indicated that "the microscopic check" of the other firearms was performed. (Tr. 1458.) Moreover, defense counsel had the opportunity to cross-examine Matt regarding all of his findings at the

bindover hearing in juvenile court.[1]   Referring to the transcript of the bindover

proceeding, the state asserted:

> [THE STATE]:  I just wanted to direct defense counsel's attention to page 140 to 144, which was Dylan Matt's testimony.  Specifically, a question was asked whether all four firearms were checked and compared to the shell casing.  It was answered.  And, in addition, defense counsel even during this testimony asked for a break for the recess for cross-examination, again, on top of that.

(Tr. 1483.)

{¶ 60} In response to the parties' arguments, the trial court ruled that Matt

could testify about the tests and comparisons of the other firearms.  The trial court

reasoned:

> THE COURT:  But I don't understand the state to be saying that they're in the report.  I think the state is saying that you were on notice as of this date that this testimony that Mr. Matt gave today, he was going to give again, and that you had an opportunity to do cross-examination on this day.
>
> * * *
>
> I'll review [the case] you just handed me as well, but to me, there's potentially factually a very important difference, which is that here you have testimony under oath in a bindover proceeding * * * .
>
> His conclusion was page 144; answer at lines 7 through 10.  * * *
>
> * * *
>
> [H]e says right here, "I was able through microscopic comparisons to determine that."  And that was the objection we've been fight about all afternoon.  And then you have the opportunity to cross on that at this hearing.
>
> * * *

---

[1]  Appellant's trial counsel also represented him at the juvenile bindover hearing.

[W]hat I'm saying is that as of the date of the bindover hearing, you knew exactly what Mr. Matt testified to and you had the opportunity. Whether you did it or not is work product. I don't care. I'm not going to inquire into that, but you had the opportunity to provide this to your consultant previously * * * So, I think you're on notice.

That conclusion is on page 144, line 7 through 10, as I read it.

* * *

When you put it together with the prior question, did any of them; did any of the weapons tested, and the answer is one did. That's what we have been fighting about.

So I think you're on notice.

(Tr. 1490, 1494-1496.)

{¶ 61} Although Matt's conclusions regarding the other firearms were not expressly discussed in his report, defense counsel was aware of them and had the opportunity to cross-examine Matt about his findings in a prior proceeding. The defense also had the opportunity to give the transcript of the prior proceeding to appellant's own expert for consultation in advance of the trial. Therefore, although Matt's conclusions with respect to the other firearms were not in his report, his testimony on those subjects was no surprise.

{¶ 62} And, even if we strictly apply Crim.R. 16(K), as *Boaston* requires, and hold that Matt's testimony regarding the other firearms was admitted in error, we find the error harmless. "'The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence.'" *State v. Keith*, 8th Dist. Cuyahoga No. 69267, 1997 Ohio App. LEXIS 914, 25 (Mar. 13, 1997), quoting *Delaware v. Van Arsdall*, 475

U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).  Crim.R. 52(A) defines the harmless-error doctrine in criminal cases and provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

{¶ 63} In determining whether the erroneous admission of evidence constitutes harmless error under Crim.R. 52(A), courts apply the following three-part test:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. * * * Second, it must be determined whether the error was not harmless beyond a reasonable doubt. * * * Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. * * *

*Boaston* at ¶ 63, quoting *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37, citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25, 27-29, 33.

{¶ 64} Appellant was on notice of Matt's opinions with respect to the Thorpes' other firearms, previously cross-examined Matt on his opinions, and had the opportunity to share Matt's prior testimony with a defense expert.  He, therefore, was not prejudiced by the fact that the opinions were not expressly stated in Matt's report.

{¶ 65} Moreover, even if the opinions regarding the other weapons had been excluded, the outcome of the trial would not have been different.  Matt's most important opinion was that the bullet and shell casing found at the crime scene were

consistent with a bullet and shell casing test-fired from the gun found in appellant's dresser drawer. This opinion was included in his report and was not subject to exclusion.

{¶ 66} In addition, appellant's DNA was found on the trigger of that gun as well as on the live rounds in the magazine inside the gun found in appellant's dresser. And, appellant's friend, A.J., testified that appellant showed him Nicole's dead body during a FaceTime call on the night before her body was found, and cell phone records placed appellant in the vicinity of the crime scene the night before Nicole's body was found. He was the last person known to be with Nicole while she was alive. Under the totality of the evidence presented, appellant would have been found guilty even if Matt's opinions regarding other firearms had been excluded. Therefore, the admission of Matt's opinions regarding the other firearms was harmless beyond a reasonable doubt.

{¶ 67} The fifth assignment of error is overruled.

### F. Motion to Suppress

{¶ 68} In the sixth assignment of error, appellant argues the trial court erred in overruling his motion to suppress without a hearing. He contends the trial court erred in concluding that a hearing to challenge the sworn statements in the search warrant affidavit was unnecessary.

{¶ 69} Appellate review of a motion to suppress generally presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. At a suppression hearing, the trial court assumes the role of trier

of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.* With respect to the trial court's conclusions of law, however, our standard of review is de novo. *Id.* In this case, where no factual evidence was presented, we review the trial court's decision de novo. *State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.2d 1167, ¶ 8.

{¶ 70} The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Probable cause requires a fair probability that criminal activity exists, not a prima facie demonstration of criminal activity. *State v. George*, 45 Ohio St.3d 325, 329, 544 N.E.2d 640 (1989). If the totality of the circumstances establishes a "fair probability that contraband or evidence of a crime will be found in a particular place," then a judge may properly issue a search warrant. *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 71} Search warrant affidavits are presumed valid. *State v. Sheron*, 8th Dist. Cuyahoga No. 98837, 2013-Ohio-1989, ¶ 29. However, where a search warrant is based on false statements in the affidavit submitted to establish probable cause, the fruits of the search warrant must be suppressed. *Franks v. Delaware*, 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A "*Franks* challenge," which challenges the factual veracity of a warrant affidavit, requires allegations of deliberate falsehood or reckless disregard for the truth. *State v. Roberts*, 62 Ohio St.2d 170, 178, 405 N.E.2d 247 (1980), citing *Franks* at 171.

{¶ 72} To merit a *Franks* hearing, the defendant must first make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and that probable cause was based the alleged false statement. *Franks* at 155-156. *See also Roberts* at 177.

{¶ 73} In *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, the Ohio Supreme Court recognized an additional exception to the deference given to the issuance of a search warrant supported by probable cause set forth in *Franks*. In *Castagnola*, the court held that even where facts are not false, a detective may not usurp the inference-drawing function of a neutral, detached magistrate in determining probable cause by failing to disclose inferences drawn and presenting those inferences as empirical facts. *Id.* at ¶ 42. However, even if a defendant makes a preliminary showing of a false statement or improper inference, a hearing is not required unless, without the allegedly false statements, the affidavit is unable to support a finding of probable cause. *Roberts* at 178, citing *Franks* at 171-172.

{¶ 74} Appellant argued in the trial court that Det. Menary's statements in the search-warrant affidavit relating to cell phone tower data improperly presented inferences as empirical fact and that those statements were directly relevant to the issuing judge's probable-cause determination. Appellant further alleged that Det. Menary omitted relevant facts from his affidavit. However, even if the statements relating to the cell phone tower data were removed from the affidavit, the search-warrant affidavit still supported the probable-cause determination.

{¶ 75} Det. Menary's affidavit included 17 separate, sworn statements to support a finding of probable cause. Det. Menary averred, in relevant part, that shortly after the investigation commenced, "it was determined that Nicole Thorpe's cousin, Alonzo Thorpe, age 15, and her boyfriend Lonniel Hawthorne were the last people to see her alive the day before * * * ." Det. Menary interviewed appellant, "who stated that he left Nicole Thorpe's residence at * * * 1600 hours on 1-7-18" and that "he then walked to [ ] McDonald's" and "was picked up by mother and taken to Shaker Heights, where he remained for the rest of the evening." Appellant alleged that Det. Menary omitted from his affidavit the fact that appellant's statement was corroborated by video surveillance footage obtained from an Ace Hardware Store and a street camera located on Turney Road in Garfield Heights.

{¶ 76} Det. Menary also stated that he interviewed Lonniel Hawthorne "who stated that he left Nicole Thorpe's residence at approximately 1430 hours on 1-7-18, drove to his residence in Euclid, and never returned to Garfield Heights," and that he stated "Alonzo Thorpe was still at Nicole Thorpe's residence when he left." Appellant alleged that Det. Menary omitted from his affidavit the fact that investigators learned that Hawthorne did not reside in Euclid, Ohio, but that his girlfriend, Marshay Davis, lived in Euclid, Ohio.

{¶ 77} Det. Menary further averred that cell phone tower records showed that appellant was not truthful regarding his whereabouts on the night of January 7, 2018, and that cell phone records placed him in the vicinity of Nicole's house at approximately 7:01 p.m. that evening. Det. Menary further stated that cell phone

records supported Hawthorne's account of his whereabouts on the night of January 7, 2018, because they placed him in Euclid, Ohio for the remainder of the night.

{¶ 78} Det. Menary later averred that William Thorpe told police that appellant's father "had at least four (4) handguns inside his residence * * *," that he had "seen the guns inside his house and [ ] had conversation with his brother, Alonzo Thorpe, Sr., about his guns in the house," that Thorpe Sr. has a 9 mm High Point handgun, and that he "believed Alonzo Thorpe would have access to the guns."

{¶ 79} Based on these statements, the trial court reasonably concluded that the issuing judge had a substantial basis for finding the existence of probable cause, even after removing the statements that appellant alleges improperly drew inference and inserting the omitted facts. Appellant fails to acknowledge the well-established law that "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-172, 98 S.Ct. 2674, 57 L.Ed.2d 667. He failed to meet his burden in establishing a *Franks* challenge and, therefore, was not entitled to a hearing. Therefore, the trial court properly denied his request for a hearing.

{¶ 80} The sixth assignment of error is overruled.

## G. Cumulative Error

{¶ 81} In the seventh assignment of error, appellant argues the cumulative effect of the multiple errors at trial, even if singularly not sufficient to warrant reversal, together deprived him of a fair trial and violated his right to due process.

{¶ 82} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent." *State v. Allen*, 8th Dist. Cuyahoga No. 102395, 2016-Ohio-102, ¶ 53, citing *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

{¶ 83} Appellant does not provide any specific argument as to how the cumulative effect of the alleged errors deprived him of a fair trial. The Ohio Supreme Court recently held that where an appellant "offers no further analysis" except to claim that the cumulative error deprived him of a fair trial, the appellant's argument "lacks substance." *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 210.

{¶ 84} Therefore, the seventh assignment of error is overruled.

{¶ 85} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EILEEN T. GALLAGHER, JUDGE

MARY J. BOYLE, A.J., CONCURS;
MARY EILEEN KILBANE, J., DISSENTS WITH SEPARATE ATTACHED OPINION

MARY EILEEN KILBANE, J., DISSENTING

{¶ 86} I respectfully dissent. The defendant appellant was a 15-year-old juvenile at the time of the incident, babysitting for his aunt's young children. The defendant-appellant was bound over on two counts of murder and two counts of felonious assault. Ultimately, the state asked for the lesser-included offense of reckless homicide and referred to the incident as an accident. At the very least, the negligent homicide instruction should have been given.