[Cite as *State v. Davis*, 2026-Ohio-345.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,              :

                                             No. 114914

    v.                                       :

JUAN DAVIS,                              :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 5, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-685345-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, LLC, and Joseph Patituce, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Juan Davis ("Davis") appeals his convictions and claims the following errors:

1. The Appellant was denied the effective assistance of counsel as guaranteed by both our federal and state constitutions.

2. Appellant was denied the effective assistance of counsel when trial counsel failed to object to an improper transferred purpose instruction and failed to request a curative instruction for the introduction of *Bruton* material.

3. Appellant was deprived of his right to fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

4. Appellant was deprived of his right to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution under the doctrine of cumulative error.

5. Appellant's convictions were not supported by sufficient evidence in violation of the Fourteenth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶ 2} For the reasons that follow, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Davis was charged with three counts of aggravated murder, two counts of murder, six counts of felonious assault, three counts of attempted murder, two counts of involuntary manslaughter, one count of discharging a firearm on or near a prohibited premises, and three counts of having weapons while under disability. The charges were brought in connection with a shooting incident that resulted in the death of L.D., a three-year old child, and the attempted murder of L.D.'s mother A.F. and her friend J.M. All counts, except for the having-weapons-under-disability charge alleged in Count 18, included firearm specifications and repeat-violent-offender specifications. The case proceeded to a jury trial against Davis and a codefendant, Devonte Parker ("Parker"). Prior to trial, Davis waived his right to jury

trial on one count of having weapons while under disability and on all the repeat-violent-offender specifications, which were tried to the court.

{¶ 4} A.F. testified that, at the time of the shooting, she was living in the downstairs unit of a duplex located at the corner of West 66th Street and Barberton Avenue in Cleveland. A.F. lived with her two children, L.D. and E.D., who was 11 months old. Katherine Treadway ("Treadway") lived in the upstairs unit with her two children. A.F. and Treadway were friends, and Treadway's children attended the same school as L.D. Davis is the father of one of Treadway's children.

{¶ 5} On September 28, 2023, A.F. was moving out of the downstairs unit. After loading the car with her children and the family's belongings, A.F. began reversing her car out of the driveway when she heard several gunshots. A.F. parked the car, looked in the backseat, and saw that L.D. was turning purple. (Tr. 371.) By that time, the shooting had stopped, and she removed her other child, E.D., from the car.

{¶ 6} J.M., who had been talking to A.F. as she loaded the car, was next to the car when the shots were fired, and he was shot in his right foot. J.M. saw that L.D. was turning blue and called 911. J.M. and L.D. were taken to MetroHealth Hospital, where L.D. was pronounced dead. According to Dr. David Dolinak, a bullet penetrated L.D.'s aorta and caused his death within minutes.

{¶ 7} Officer Michael Valdez ("Officer Valdez") of the Cleveland Police Department testified that he was one of the first officers to respond to the scene. Officer Valdez and his partner interviewed people at the scene. One witness was

working at an engineering firm on Barberton Avenue when he heard several gunshots. He looked out his second-floor window and observed two men carrying guns running toward a black Mercedes sedan parked on West 65th Street. The black Mercedes "sped away rapidly," but the witness was able to write down the license plate number. When the police arrived, the witness reported what he had seen and gave them the license plate number. He also gave police access to his company's surveillance videos, which showed the black Mercedes stop to pick up the two individuals the witness had seen carrying guns.

{¶ 8} Vesna Piscitello ("Piscitello"), a civilian video analyst with the Cleveland Police Department's Real Time Crime Center ("RTCC"), testified that she works with the city's Real Time Crime camera system, the Flock camera system, and the ShotSpotter system. She explained that the city has over 1,000 Real Time Crime surveillance cameras throughout the city that capture ordinary surveillance footage. The Flock camera system captures license plate information from vehicles passing through certain areas where there are license plate readers. (Tr. 635.) The ShotSpotter system uses audio sensors to detect gunshots throughout the city. Using a description of the black Mercedes sedan, Piscitello found RTCC videos of the vehicle before and after the shooting that caused L.D.'s death. She used the license plate number to locate the path the Mercedes took to and from the scene of the shooting. The Flock system registered the times when the vehicle passed by the cameras, and the information placed the Mercedes one street away from the shooting at the precise time of the shooting. (Tr. 647-652.)

{¶ 9} Jayden Sorensen ("Sorensen") was involved in the shooting that resulted in L.D.'s death. He knew Davis and his codefendant, Parker, for some time before the shooting, but he knew Davis by the nickname "Slim," and he knew Parker by the nickname "Baby." Sorensen testified that on September 28, 2023, he saw Davis and Parker in the neighborhood and he asked them for "a shell" to smoke marijuana. Davis said "okay" but indicated that he had to "bust a move." (Tr. 690.) Sorensen got into the backseat of the Mercedes Davis was driving, and they drove off.

{¶ 10} According to Sorensen, Davis seemed irritated and was talking to someone on the phone as they traveled to West 66th Street. When they reached the destination, Davis backed the Mercedes into the driveway of an abandoned building, handed a rifle to Sorensen, and told him to follow Parker. (Tr. 695.) Sorensen took the rifle and exited the car with Parker, whom he observed holding a Canik 9 mm handgun. (Tr. 694.) Sorensen followed Parker around some abandoned buildings until Parker lifted the handgun and fired several shots toward a house across the street. Sorensen attempted to fire his AR-style rifle in the same direction as Parker's weapon, but "the gun wasn't working." (Tr. 695.) After the shooting, Parker and Sorensen ran back to Davis, who drove them away from the scene. (Tr. 697.) As Sorensen was leaving Davis's vehicle, Davis threatened Sorensen that if he told anyone about the shooting he would "smoke" Sorensen's family. (Tr. 698.)

{¶ 11} Police arrested Sorensen for his involvement in the shooting on September 30, 2023, two days after the shooting. On the day of his arrest, Sorensen

made a statement to police and described the incident. He also identified Parker and Davis out of separate photo arrays, and he told police that Parker fired a Canik 9 mm handgun at the victims. (Tr. 702-704 and 835.)

{¶ 12} At trial, Sorensen identified Davis as the driver of the Mercedes and Parker as the shooter, who shot and killed L.D. He testified that Davis instructed them to "put some holes in the car." (Tr. 834.) Sorensen also stated that Parker was wearing two jackets and a pair of slip-proof Crocs at the time of the shooting. One of the jackets had a hood. Sorensen identified photos of clothes taken from Parker's house as the clothes he was wearing on the day of the shooting. (Tr. 709-710.)

{¶ 13} During his statement to police, Sorensen, who was 16 years old, told his mother that he did not want to spend 20 years of his life in prison. He nevertheless told police about Davis and Parker's involvement in the shooting. (Tr. 829.) He did not admit his own involvement in the shooting at that time. However, he later entered into a plea agreement with the State whereby Sorensen admitted his role in the shooting and agreed to plead guilty to one count of involuntary manslaughter with a three-year firearm specification, two counts of attempted murder, one count of felonious assault, and one count of improper handling of a firearm in a motor vehicle in exchange for his truthful testimony at Davis's trial. (Tr. 700-701.) Sorensen's plea agreement included an agreed sentencing range of between 10 and 20 years in prison. (Tr. 701.)

{¶ 14} Thomas Morgan ("Morgan"), a supervisor in the firearm and toolmark unit at the Cuyahoga County Medical Examiner's Office, testified that the bullet

recovered from L.D.'s body was consistent with a 38/9 mm caliber bullet. (Tr. 969.) He compared that bullet with ten shell casings found at the scene and concluded that they were all fired by the same gun. (Tr. 976-977.)

{¶ 15} Detective Charles Shultz ("Det. Shultz") of the Cleveland Police Homicide Unit testified that a Canik 9 mm handgun was recovered in March 2024 during a traffic stop of individuals unrelated to this case. (Tr. 1308.) Det. Shultz explained that guns that have been used to kill people "get passed around and sold." (Tr. 1432.) Morgan examined the Canik 9mm handgun recovered from the traffic stop and determined that it was the gun that fired all the bullets and shell casings found at the scene and in L.D.'s autopsy. (Tr. 976-977.) Det. Shultz explained that the identity of the shooter and the brand of gun were unknown to police until Sorensen revealed them to police at the time of his arrest on September 30, 2023. (Tr. 1312.)

{¶ 16} Det. Shultz testified regarding the police interview of Davis, which was recorded and played for the jury. During the interview, Davis admitted that he drove a black Mercedes to West 66th Street on September 28, 2023. However, Davis claimed he went there with "two dudes" whose names he did not know to buy "weed" from J.M. Davis admitted that one of the "dudes" was older than the other, that the younger one was 16 years old, and that the younger one had lighter skin than the older one. Davis also admitted that he was an accomplice to L.D.'s murder, but he claimed he did not know the individuals were going to commit the crime. (Tr. 1259-1260 and 1269.) Davis admitted that he heard gunshots, but he denied seeing either

of the two men with guns. Davis told detectives that he happened to be at the wrong place at the wrong time and that he had no idea that a shooting was going to take place. (Tr. 1287.) Finally, Davis admitted that, pursuant to a no-contact order, he was not allowed to contact Treadway and he was wearing a GPS ankle monitor to ensure that he stayed away from her. (Tr. 1268.)

{¶ 17} Det. Shultz testified that police extracted data from Treadway's phone and that the extraction showed she texted Davis numerous times despite the no-contact order. (Tr. 1276.) On the day before the shooting, Treadway texted Davis and told him she was not going to appear in court on the case in which she was the victim and Davis was the alleged perpetrator. (Tr. 1277.) However, A.F. was another eyewitness to the crimes alleged in that case. (Tr. 1281.)

{¶ 18} Treadway's phone records show that she called Davis several times in the hours leading up to the shooting. (Tr. 1279-1280.) According to the ShotSpotter system, the shooting occurred at 2:16 p.m. Treadway's phone records show that she called Davis several times between 2:03 p.m. and 2:18 p.m. (Tr. 1280.) She also called 911 after the shooting. However, Treadway called Davis before calling 911, immediately after the shooting. (Tr. 1280 and 1286.)

{¶ 19} Det. Shultz described the information obtained from the GPS ankle monitors that Davis and Sorensen were wearing at the time of the shooting. (Tr. 1283-1286.) The GPS records show that Davis was driving near Dearborn Avenue at 2:10 p.m. on the day of the shooting. From Dearborn, Davis continued to Wentworth Avenue, where a female acquaintance of Parker's lived. (Tr. 1283-1285

and 1435.) These streets are in the vicinity of West 66th Street, where the shooting occurred. At the time of the shooting, which occurred at 2:16 p.m., Davis's GPS monitor placed Davis on Barberton Avenue, which intersects with West 66th Street, and Sorensen's GPS monitor placed him on West 66th Street, where the shooting occurred. (Tr. 1286.)

{¶ 20} Finally, Det. Shultz testified that several photographs extracted from Sorensen's phone showed Sorensen and Parker posing together. Parker is depicted in one of the photos wearing the same black jacket that he was wearing on the day of the shooting. (Tr. 1306; State's exhibit No. 628.) Although Davis claimed that Parker and Sorensen went to the house on West 66th Street to buy marijuana, Det. Shultz testified that they found no evidence of any marijuana sales during the investigation. (Tr. 1260-1261.)

{¶ 21} After hearing all the evidence, the jury found Davis not guilty of the aggravated-murder charges alleged in Counts 1 and 2 of the indictment. However, the jury found him guilty of two counts of murder, six counts of felonious assault, three counts of attempted murder, and one count of discharging a firearm on or near a prohibited premises as alleged in Counts 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15, including the attendant firearm specifications.[1] The court found Davis guilty of involuntary manslaughter, as alleged in Count 16, as well as all the firearm and repeat-violent-offender specifications that were tried to the bench. After merging

---

[1] The jury also found Parker guilty, and the trial court sentenced him to life in prison with parole eligibility after 49 years.

allied offenses of similar import, the court sentenced Davis to life in prison with eligibility of parole after 49 years.  This appeal followed.

## II.  Law and Analysis

### A.  Ineffective Assistance of Counsel

{¶ 22} In the first and second assignments of error, Davis argues his Sixth Amendment right to the effective assistance of counsel was violated because his trial counsel (1) failed to request a jury instruction on the lesser-included offense of reckless homicide, (2) failed to object to statements made by nontestifying codefendants, (3) failed to request a severance of his trial from that of his codefendant, Parker, (4) failed to object to an allegedly improper jury instruction on transferred intent, and (5) failed to request a curative instruction for the introduction of *Bruton* material.  We discuss these assigned errors together because they involve the same legal standard.

{¶ 23} To establish ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that deficient performance.  *Strickland v. Washington*, 466 U.S. 668 (1984).  Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

{¶ 24} Every properly licensed attorney is presumed to be competent. *State v. Black*, 2019-Ohio-4977, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98,

100 (1985). Thus, in evaluating a claim for ineffective assistance of counsel, the reviewing court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.) ("A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

### 1. Lesser-Included Offense Instruction

{¶ 25} Davis first argues his trial counsel was ineffective because he failed to request a jury instruction on reckless homicide as a lesser-included offense of murder as alleged in Count 3 of the indictment.

{¶ 26} Reckless homicide can be a lesser-included offense of murder depending on the facts of the case. *See State v. Thorpe*, 2021-Ohio-1295 (8th Dist.). The question of whether a particular offense should be submitted to the factfinder as a lesser-included offense involves a two-tiered analysis. *Id.* at ¶ 16, citing *State v. Evans*, 2009-Ohio-2974, ¶ 13. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *State v. Deanda*, 2013-Ohio-1722, ¶ 6, citing *State v. Kidder*, 32 Ohio St.3d 279, 281 (1987).

{¶ 27} The second tier requires the court to review the evidence and determine whether "'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'"

*Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 2007-Ohio-2072, ¶ 11. "Only in the second tier of the analysis do the facts of a particular case become relevant." *Deanda* at ¶ 6.

{¶ 28} Davis was convicted of murder in violation of R.C. 2903.02(A), which states, in relevant part, that "[n]o person shall purposely cause the death of another[.]" "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 29} R.C. 2903.041 governs reckless homicide and states that "[n]o person shall recklessly cause the death of another[.]" "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "Substantial risk" is defined in R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."

{¶ 30} Davis argues his trial counsel should have requested a jury instruction on reckless homicide as a lesser-included offense of murder because Sorensen testified that Davis was never "talking about killing a baby" and that Davis did not intend to harm anyone; he merely wanted to "put holes in the car." (Appellant's brief p. 11, tr. 834-835.) He cites *State v. Turner*, 2019-Ohio-144 (2d Dist.), and *State v. Duncan*, 2006-Ohio-5009 (8th Dist.), in support of his argument.

{¶ 31} In *Duncan*, the defendant and the victim were arguing over money and the defendant pulled out a handgun. The defendant testified at trial that he "only intended to scare [the victim]," but the two men "struggled for control of the firearm" and it "accidentally went off" and killed the victim. *Id*. at ¶ 2. The defendant was charged with aggravated murder as well as other felonies. On the aggravated-murder charge, the jury found the defendant guilty of the lesser-included offense of reckless homicide, presumably because it believed the defendant killed the victim accidentally rather than purposely. *Id*. at ¶ 3.

{¶ 32} In *Turner*, the defendant was arguing with a former employee over money, and the defendant drew a handgun from his car. The defendant approached the passenger's side of the employee's car with his gun, and a struggle over the weapon ensued. *Id*. at ¶ 7. The gun went off during the struggle and a passenger in the employee's car was shot and killed. The defendant testified at trial that he only intended to "scare" the employee, that the gun "just went off," and that he "never intended to hurt anyone." *Id*. at ¶ 7. Indeed, the defendant testified that he did not know the gun was loaded. *Id*. at ¶ 8. Based on these circumstances, the Second District held that a jury could have found the defendant not guilty of purposeful murder and guilty of reckless homicide. Thus, the Second District held that the trial court should have given a jury instruction on reckless homicide as a lesser-included offense. *Id*. at ¶ 38.

{¶ 33} In both *Duncan* and *Turner*, a single gunshot was fired while the defendant in each case was wrestling with someone. And, the defendant in *Turner*

did not know the gun was loaded. There was no evidence that either defendant intentionally aimed his gun at either of the victims. The victim in *Turner* was an innocent bystander and not the person with whom the defendant was fighting. Thus, a jury could have found that each defendant acted recklessly rather than purposely.

{¶ 34} By contrast, Davis's accomplice, Parker, fired 13 bullets directly into the victims' car at the victims as it was reversing down the driveway. As previously stated, a person acts purposely "when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). In other words, "[a]n act is committed 'purposely' when it is a person's specific intent to cause a certain result." *State v. Krueger*, 2010-Ohio-3725, ¶ 21, citing R.C. 2901.22(A).

{¶ 35} The Ohio Supreme Court has held that an intent to kill may be presumed where the natural and probable consequence of a wrongful act is to produce death. *State v. Robinson*, 161 Ohio St. 213 (1954); *State v. Gardner*, 74 Ohio St.3d 49, 60 (1995) ("[P]ersons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts."); *State v. Eley*, 77 Ohio St.3d 173, 180 (1996) (holding that intent to kill "may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life designed for that purpose, and the manner of inflicting a fatal wound").

{¶ 36} "'Intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death.'" *State v. Kincaid*, 2007-Ohio-2228, ¶ 23, quoting *State v. Mackey*, 1999 Ohio App. LEXIS 5902 (8th Dist. Dec. 9, 1999). Hence, this court has held that "the act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Kincaid*, 2007-Ohio-2228, ¶ 23 (8th Dist.), citing *State v. Collins*, 2005-Ohio-1642, ¶ 39 (5th Dist.). *See also State v. Brown*, 1996 Ohio App. LEXIS 801 (8th Dist. Feb. 29, 1996) ("The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence.").

{¶ 37} L.D.'s death was not an accident; it was the natural and probable consequence of Parker's act of shooting 13 bullets at a car that was occupied by three people. Davis was an accomplice to Parker's actions. Therefore, an instruction on reckless homicide was not warranted by the evidence, and counsel was not ineffective for not asking for it.

### 2. Nontestifying Codefendants

{¶ 38} Davis argues his trial counsel was ineffective because he failed to object to out-of-court statements made by nontestifying codefendants that were admitted into evidence. He contends the admission of Treadway's text messages to Davis and statements that Parker made to Sorensen during the commission of the offense violated *Bruton v. United States*, 391 U.S. 123 (1968), and the Confrontation Clause of the Sixth Amendment to the United States Constitution.

{¶ 39} The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). Thus, whenever the State seeks to introduce hearsay into evidence in a criminal proceeding, the court must determine not only whether the evidence fits within an exception to the hearsay rule, but also whether the introduction of such evidence offends an accused's right to confront witnesses against him. *State v. Kilbane*, 2014-Ohio-1228, ¶ 29 (8th Dist.).

{¶ 40} In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that the Confrontation Clause bars the admission of "testimonial statements of witnesses absent from trial." *Id.* at 59. The Court explained that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." This means that the state may not introduce "testimonial" hearsay against a criminal defendant, regardless of whether such statements are deemed reliable, unless the defendant has an opportunity to cross-examine the declarant. *Id.* at 53-54, 68.

{¶ 41} However, the *Crawford* Court held that the Confrontation Clause only requires exclusion of "testimonial" as opposed to "nontestimonial" evidence. *See Crawford* generally. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S.

813, 821 (2006).  If a statement is not testimonial, the principles embodied in the Confrontation Clause do not apply.  *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).

{¶ 42} Although the *Crawford* Court did not specifically define the term "testimonial," it explained that hearsay statements are implicated by the Confrontation Clause when they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford* at 52.

{¶ 43} In *Bruton*, 391 U.S. 123, the United States Supreme Court held that in a joint jury trial, confessions made by a codefendant who exercises his or her Fifth Amendment right not to testify are not admissible against the other defendant because that defendant has no opportunity to cross-examine the codefendant who made the confession.  *State v. Cassano*, 2012-Ohio-4047, ¶ 30 (8th Dist.), citing *Bruton*, 391 U.S. at 123.  However, the admission of nonhearsay is not a *Bruton* violation.  *Id.*, citing *United States v. Inadi*, 475 U.S. 387, 398, fn. 11 (1986) (stating that nonhearsay does not violate the defendant's right to confront witnesses); *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) ("Because this testimony was not used for the truth of the matter asserted by the out-of-court declarant, it was not hearsay, and *Bruton* is inapposite.").

{¶ 44} Davis objects to text messages Treadway sent to Davis wherein she told Davis she was not going to appear in court as a witness in the criminal case against him.  This communication was not made for use at a later trial since she was

admitting that she was not going to appear in court as a witness. Therefore, the Confrontation Clause was not implicated by the text messages.

{¶ 45} The text messages were also not hearsay because they were not offered for the truth of the matters asserted therein; they were offered to prove a motive for the shooting. Earlier in the trial, A.F. testified that she was a witness to the incident that gave rise to the criminal case against Davis. Treadway's text messages referred to the same criminal case but indicated that Treadway was not going to appear in court, which left A.F. as the only remaining eyewitness. Based on this evidence, an inference could be made that Davis intended to kill A.F. to prevent her from testifying as a witness against him. Because the statements were not offered for the truth of the matters asserted, they were not hearsay, did not violate the Confrontation Clause, and did not violate *Bruton*. Therefore, counsel was not ineffective for failing to object to the text messages.

{¶ 46} Davis also objects to statements Parker made to Sorensen during the shooting. Sorensen testified that Parker knew where to go before and after the shooting. These statements were obviously not made for use at a later trial since they were incriminating statements between coconspirators. Pursuant to Evid.R. 801(D)(2)(e), hearsay does not include "a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." The surveillance video depicting Davis dropping the shooters off near the crime scene, the shooters working in concert to commit the shooting, and Davis picking them up afterwards provided independent

proof of the conspiracy. Therefore, the statements Parker made to Sorensen were not hearsay, did not violate either the Confrontation Clause or *Bruton,* and counsel was not deficient for not objecting to them.

### 3. Separate Trials

{¶ 47} Treadway requested and received a separate trial from Davis and Parker. Davis argues his trial counsel was ineffective because he failed to also request a separate trial from Parker.

{¶ 48} Crim.R. 8(B) governs the joinder of defendants and states that "[t]wo or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct."

{¶ 49} "'The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting Crim.R. 8. *See also State v. Dean*, 2015-Ohio-4347, ¶ 58. "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992), citing *State v. Torres*, 66 Ohio St.2d 340, 343 (1981); 2 LaFave & Israel, *Criminal Procedure,* (1984) § 17.1, 354-355.

{¶ 50} However, Crim.R. 14 requires separate trials when joinder would result in prejudice. The rule states: "If it appears that a defendant or the [S]tate is

prejudiced by a joinder of offenses or of defendants in an indictment . . . the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."

{¶ 51} A defendant claiming error in the joinder of multiple indictments for trial bears the burden of affirmatively showing that his or her rights were prejudiced. *State v. Spaulding*, 2016-Ohio-8126, ¶ 62. The State can challenge the claim of prejudice "by showing either that (1) it could have introduced evidence of the joined offenses as 'other acts' under Evid.R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990).

{¶ 52} Under the "other-acts" test, the State must show that it could have introduced evidence of the other crimes at separate trials under Evid.R. 404(B) if it had tried them separately. Under the "simple and direct" test, a defendant is not prejudiced by joinder when each crime can be proven by simple and direct evidence, such that a jury is likely to be able to segregate the proof required for each offense. *State v. Bell*, 2019-Ohio-787, ¶ 25 (8th Dist.).

{¶ 53} Evidence is "simple and direct" if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would "improperly consider testimony on one offense as corroborative of the other." *State v. Wright*, 2017-Ohio-8702, ¶ 52 (4th Dist.), citing *State v. Freeland*, 2015-Ohio-3410 (4th Dist.).

{¶ 54} Before the trial began, Treadway's lawyer requested a severance of her trial because both she and Davis gave pretrial statements to detectives. (Tr. 19-22.) Because Treadway and Davis were codefendants and the State sought to introduce their statements into evidence, the statements would have violated *Bruton*. (Tr. 16-22.) Therefore, prosecuting Treadway in a separate trial was necessary to prevent a *Bruton* violation. There was no danger of a *Bruton* violation in the joint trial of Davis and Parker.

{¶ 55} Moreover, the evidence presented in the trial was simple and direct. All of the offenses arose from a single incident. The surveillance videos clearly showed Parker and Sorensen exit the Mercedes, shoot at the victims, and run back to the Mercedes. Sorensen testified that Davis was the driver of the getaway car. Indeed, Davis does not argue that the evidence was confusing, and he fails to demonstrate how he was prejudiced by the joint trial of Parker and Davis. Therefore, he fails to establish that his counsel was ineffective for not asking for a separate trial.

### 4. Jury Instructions

{¶ 56} Davis argues his trial counsel was ineffective because he (1) failed to object to an erroneous jury instruction on the concept of transferred intent and (2) failed to request an instruction that the statements introduced in violation of *Bruton* be considered only against his codefendant, Parker. However, having determined that there was no *Bruton* violation, counsel was not ineffective for failing to request an instruction related to *Bruton*.

{¶ 57} Under the doctrine of transferred intent, even if the victim was not the intended target, a defendant is as criminally culpable for the harm caused to the actual victim as he would be if the victim had been the intended target. *State v. Calhoun*, 2015-Ohio-5505, ¶ 16 (12th Dist.), citing *In re T.K.*, 2006-Ohio-3056, ¶ 16 (upholding a juvenile's adjudication for aggravated rioting and complicity to felonious assault where the juvenile's intent to harm one victim was transferred to two other victims).

{¶ 58} In charging the jury, the court initially included words the parties chose to omit. However, it immediately corrected the mistake and instructed the jury as follows:

> Transferred intent. If you find that the defendant intended to cause the death of [J.M.] and/or [A.F.] and that his act unintentionally caused the death of [L.D.], then the defendant is as responsible as if his act had harmed the intended person.

(Tr. 1483.) This instruction is a correct statement of the law on transferred intent. Therefore, counsel was not ineffective for failing to object to it.

{¶ 59} Having reviewed all of Davis's claims for ineffective assistance of counsel, we find that Davis was represented by competent counsel. Therefore, the first and second assignments of error are overruled.

## B. Prosecutorial Misconduct

{¶ 60} In the third assignment of error, Davis claims his constitutional right to a fair trial was violated by prosecutorial misconduct.

{¶ 61} In reviewing a claim for prosecutorial misconduct, the relevant inquiry is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Froman*, 2020-Ohio-4523, ¶ 114, quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In answering that question, the reviewing court considers "whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights." *Id*., citing *State v. Maxwell*, 2014-Ohio-1019, ¶ 243. In evaluating prejudice, the court considers "the effect that the misconduct had 'on the jury in the context of the entire trial.'" *Id*., quoting *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993).

{¶ 62} Davis argues the prosecutor violated a stipulated agreement that the State would not introduce evidence as to why Davis was wearing a GPS monitor because it involved another criminal case where Treadway was listed as the victim. In discussing the GPS monitor, defense counsel stated, in relevant part:

> Well, Your Honor, we would have no problem stipulating that Mr. Davis was on court supervised release provided, you know, we would not like the State to put on any evidence as to what the nature of those charges were or why he was on the ankle monitor other than the fact that he was on pretrial release.

(Tr. 49.) The State agreed to this stipulation but both sides understood that the existence of the separate criminal case itself would be an issue during the trial as evidenced by the parties' respective opening statements. For example, the State was permitted to offer GPS evidence of Davis's location at the time of the shooting. It also mentioned the prior incident between Davis and Treadway in order to establish

the motive for the shooting. Treadway told Davis that she was not going to appear in court for Davis's case, but A.F. was another eyewitness to the incident. The implication was that Davis orchestrated the shooting of A.F.'s car in order to prevent her from testifying in Davis's criminal case. (Tr. 332.) These facts were established without the State ever mentioning the nature of the charges or any of the facts of that case other than that A.F. was a witness. Therefore, the prosecutor did not commit any misconduct relative to the stipulation.

{¶ 63} Davis nevertheless argues that the prosecutor committed misconduct by (1) asking Sorensen whether L.D., who weighed 40 pounds, could take a bullet; (2) asking Det. Shultz how many children Davis has; (3) asking Det. Shultz whether there was any objective evidence that Davis bought marijuana from J.M. in the past; and (4) asking Det. Shultz "is that even physically, humanly possible for that to have happened?" (without identifying the thing that was not possible).

{¶ 64} During the cross-examination of Sorensen, defense counsel asked Sorensen why he did not run away when Davis handed him a rifle and told him to go with Parker. Sorensen replied, in relevant part, "I weigh 80 pounds . . . I can't take no bullet." (Tr. 742.) On redirect, the prosecutor reminded Sorensen that he previously stated that he could not take a bullet because he weighed 80 pounds. Thereafter, the following exchange took place:

> PROSECUTOR: This is [L.D.]. He's 40 pounds. You think he can take a bullet?
>
> SORENSEN: No sir.

PROSECUTOR: Tell me something, why is this little boy dead?

SORENSEN: I don't know sir.

PROSECUTOR: Who did it?

SORENSEN: Baby.[2]

(Tr. 833.) The prosecutor's questions were directed at a material issue in the trial, namely who killed L.D. And the answer was Parker, not Davis. Although it would have been better if the prosecutor had not mentioned L.D.'s weight, evidence of his weight did not unfairly prejudice the jury because it already knew the victim was a three-year old child. Photographs of L.D. had previously been introduced into evidence. Therefore, the remark that he only weighed 40 pounds could not have unfairly prejudiced Davis.

{¶ 65} The questions posed to Det. Shultz were similarly innocuous. On cross-examination, defense counsel asked Det. Shultz questions about the statement Davis made to police that he had previously bought marijuana from J.M. and that his "two dudes" had bought marijuana from J.M. (Tr. 1321-1323.) Defense counsel also asked Det. Shultz about the location of the shooting and whether Davis had children that lived at that address. (Tr. 1340.) Finally, defense counsel asked Det. Shultz whether Davis could have heard the gunshots from where he had parked, to which Shultz answered "yes," and whether Davis could have seen into the victim's vehicle, to which he answered "no." (Tr. 1342.)

---

2 As stated earlier, "Baby" is Parker's nickname.

{¶ 66} During the direct examination of Det. Schultz, the prosecutor followed up the questions about buying marijuana with the following exchange:

> PROSECUTOR: Okay. And you know in that statement Juan Davis said that he and his two dudes had bought from [J.M.] before. Do you remember him saying that?
>
> DET. SHULTZ: Yes.
>
> PROSECUTOR: All right. Let me ask you this: Is there any objective evidence that supports that Juan Davis bought marijuana from [J.M.] before?
>
> DET. SHULTZ: No, there's not.
>
> PROSECUTOR. Any objective evidence that supports that his two dudes whose names he didn't give bought marijuana from [J.M.] before?
>
> DET. SHULTZ: No.

(Tr. 1421.) The prosecutor's questions were designed to discredit Davis's excuse for dropping Sorensen and Parker off at the crime scene. Davis wanted the police to believe they were going to buy marijuana when there was no evidence of marijuana sales. The prosecutor's statement about whether it was even physically possible, given the video evidence and the timing of the gunshots, that Parker and Sorensen could buy marijuana from J.M. before the shooting was also designed to attack Davis's credibility. Therefore, these questions were appropriate and did not amount to misconduct.

{¶ 67} Finally, the prosecutor asked Det. Shultz how many children Davis had during the playing of Davis's videotaped statement to police wherein he told them that he had 17 children. Thus, Davis was the one who raised the issue of how

many children he has in the videotaped interview that was played for the jury. Therefore, the prosecutor's follow-up questions on that issue were not unfair or inappropriate, and there is no evidence of prosecutorial misconduct.

{¶ 68} The third assignment of error is overruled.

## C. Cumulative Error

{¶ 69} In the fourth assignment of error, Davis argues the cumulative effect of the many errors that occurred during his trial deprived him of a fair trial.

{¶ 70} Under the cumulative-error doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Hunter*, 2011-Ohio-6524, ¶ 132. However, to find cumulative error, we must first find that multiple errors were committed at trial. *Id.* Because we have not found any errors at trial in this case, we cannot find cumulative error. Therefore, the fourth assignment of error is overruled.

## D.  Sufficiency of the Evidence

{¶ 71} In the fifth assignment of error, Davis argues there is insufficient evidence to support a complicity theory of liability on which his convictions are based. He contends that because he was not the shooter who actually killed L.D. and Sorensen testified that Davis did not intend to harm anyone, there is no evidence to prove that he was an accomplice of Parker, the actual gunman.

{¶ 72} The test for sufficiency requires a determination as to whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-

3598, ¶ 12 (8th Dist.). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 73} R.C. 2923.03 governs complicity and states, in relevant part:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

{¶ 74} To prove complicity by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed." *State v. Lett*, 2005-Ohio-1308, ¶ 29 (8th Dist.), citing *State v. Cartellone*, 3 Ohio App.3d 145, 150 (8th Dist. 1981). "Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout." *Id.*

{¶ 75} The evidence showed that Davis drove Parker and Sorensen to A.F.'s home where the shooting occurred and that he drove them away from the scene

immediately after the shooting. Sorensen testified that Davis instructed him to take a rifle and follow Parker to the shooting. And, there was evidence that Davis wanted to prevent A.F. from testifying against him in a criminal case against him.

{¶ 76} The numerous calls and text messages between Treadway and Davis established that Treadway was helping Davis coordinate the attack on A.F. and her family. A.F. testified that Treadway helped put her children in the car before walking behind the house while she was on the phone. And Sorensen testified that Davis was talking to someone while they were driving to A.F.'s house and that Davis seemed "irritated." (Tr. 716-717.) Treadway's phone records show that she called Davis several times between 2:03 p.m. and 2:18 p.m., and the shooting occurred 2:16 p.m. (Tr. 1280.) She also called 911 after the shooting, but not before she called Davis. (Tr. 1280 and 1286.)

{¶ 77} Parker shot his handgun 13 times toward A.F.'s car as it was reversing out of the driveway. Based on the evidence presented, it was reasonable for a jury to infer that everyone involved in the conspiracy — Treadway, Davis, Sorensen, and Parker — wanted to kill at least one, if not all, of the people in A.F.'s car. As previously stated, "The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death." *Robinson*, 161 Ohio St. 213 at paragraph five of the syllabus. Thus, the evidence established that Davis, the sole conspirator with a motive to silence A.F., coordinated the attack on A.F.'s family that resulted in L.D.'s death.

{¶ 78} There was also evidence that Davis furthered the conspiracy after he was arrested. He denied knowing the identities of the two "dudes" he drove to A.F.'s house. He also denied knowing the reason for going there, and he denied seeing the "two dudes" with guns. These lies were aimed at concealing the identities of his coconspirators and denying his involvement in the crimes. Therefore, there was sufficient evidence to support the jury's finding that Davis was complicit in the crimes committed against J.M., A.F., and her family.

{¶ 79} The fifth assignment of error is overruled.

{¶ 80} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR